**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

GABRIEL MIDALGO,

Plaintiff,

- v -                                                      Civ. No. 9:03-CV-1128
                                                                (NAM/RFT)

SGT. BASS, SPINNER, C.O. STREETER, JOHN DOE,[1]
Head Medical Staff, C.O. BENNET,[2] SGT. TRIMM,
C.O. BOUYEA,

Defendants.

**APPEARANCES:**                                          **OF COUNSEL:**

GABRIEL MIDALGO
Plaintiff, *Pro Se*
97-A-7235
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871

HON. ELIOT SPITZER                                       SENTA B. SIUDA, ESQ.
Attorney General for the State of New York               Assistant Attorney General
Attorney for Defendants
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging

---

[1] Defendant John Doe has not been identified and therefore has not been served with the Amended Complaint or otherwise appeared in this action. *See* Dkt No 12.

[2] Plaintiff mistakenly spells Defendant Bennett's name as "Bennet." *See* Dkt. No. 23, Answer at n.1. The Court will refer to this Defendant by the proper spelling.

deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment.  Dkt. No. 8, Am. Compl. at ¶¶ 42-54.  Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment.  Dkt. No. 105.  Plaintiff opposes the Motion.  Dkt. No. 106.  For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted**.

## I. FACTS[3]

During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility.  Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3.  In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant."  Am. Compl. at ¶ 16.  Plaintiff further alleges that a wiretap was also placed in his cell during that time.  *Id.*  On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers.  *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003.  Plaintiff believed his subscriptions had been misplaced or delayed since January 2003.  *Id.* at ¶ 22.  Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs.  *Id.* at ¶ 23, Ex. C, Lt. from Girdich to

---

[3] Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York.  Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required.  *See* N.D.N.Y.L.R. 7.1(a).  Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted.  N.D.N.Y.L.R. 7.1(a)(3).  This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits.  Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint.  *See* Dkt. Nos. 1 & 8.

Midalgo, dated Feb. 5, 2003.  Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions.  *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003.  Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him.  *Id.* at ¶ 25.  Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[4]  *Id.* at ¶¶ 26 & 28.  On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read.  *Id.*, Ex. A, Grievance, dated Apr. 26, 2003.  Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[5]  *Id.*, Grievance Lt., dated May 27, 2003.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation.  Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03.  C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell.  *Id.*, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003.  Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff.  *Id.*, Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003,

---

[4] Plaintiff does not provide any specific dates as to when he received rotten or spoiled food.

[5] It is unknown to this Court whether a response from the Superintendent was received.

& Trimm Lt. to Sgt. King, dated July 29, 2003.  Sergeant King then submitted a memo to Captain

Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on

the matter, he could find no evidence to support the allegations.  *Id.*, Ex. A, Sgt. King Lt. to Captain

Bezio, dated Aug. 1, 2003.  Based on the above investigation, the Inmate Grievance Resolution

Committee ("IGRC") recommended that the grievance complaint pass through to the

Superintendent.  *Id.*, Ex. A, Case History & Record on Grievance dated June 21, 2003.  Thereafter,

the Superintendent found that the complaint had been investigated and that there was "no evidence

to support [the] complaint[.]"  *Id.*, Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.  Plaintiff

then appealed to the Central Office Review Committee ("CORC").  The CORC made several

findings which included that the Superintendent's determination be upheld based on the same

reasoning provided by the Superintendent and that there was no substantiation to the claim that

Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that

performance of the employees' duties should not be construed as harassment.[6]  *Id.*, Ex. A, CORC

Appeal, dated Oct. 1, 2003.

On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass.  Am. Compl.,

Ex. "Exhaustion of my Administrative Remedies . . . [with fight investigation]. . .," Fight

Investigation Form, dated June 27, 2003.  The form had a notation stating that Midalgo purportedly

was defending himself in a fight he had with his cellmate because they had been in rival gangs.  *Id.*

The Sergeant's assessment was that it was a real fight and they were in rival gangs.  *Id.*  After the

fight, Midalgo and his cellmate were placed in different cells.  *Id.*

---

[6] The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has
alleged he filed grievances during those months.  Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am.
Compl., Ex. A; *see also supra* p. 3.

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[7]  Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003.  Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised.  *Id.*, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003.  In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information.  *Id.*  Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility.  *Id.*

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints.  *Id.*, Ex. A, Grievance, dated July 10, 2003.  C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy.  *Id.*, Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003.  The Cell Search or Inspection Notice listed the items that were removed.  *Id.*, Ex. A, Cell Search or Inspection Notice, dated June 27, 2003.  Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing.  *Id.*, Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003.  In addition, Trimm stated that Midalgo was not in a cell with a known enemy.  *Id.*  The IGRC recommended that the grievance complaint filed pass through to the Superintendent.  *Id.*, Ex. A, Case History & Record for Grievance dated July 10, 2003.  The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy

---

[7] It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.*, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[8] *Id.*, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost . . .," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.*, Ex. "Exhaustion of my Administrative Remedies Some Material Lost . . .," Mem. from Captain Racette, dated Aug. 5, 2003.

On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.*, Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books were not available at the facility.[9] *Id.*, Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the

---

[8] Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

[9] Jean Botta is not named as Defendant in this action.

wrong books and cases from the law library.[10]  *Id.*, Ex. C, Lt., dated Aug. 4, 2003.  He also noted

that he did not receive a law book that was supposed to be available.  *Id.*  On August 5, 2003,

Midalgo received a memo from Captain Racette stating that his complaints were investigated and

that when Plaintiff was interviewed, he did not provide any further information, which resulted in a

finding that the staff acted properly.  *Id.*, Ex. "Exhaustion of my Administrative Remedies Some

Material Lost . . .," Mem. from Captain Racette, dated Aug. 5, 2003.  On August 19, 2003, Plaintiff

received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was

available but since it was in looseleaf and because Plaintiff was in SHU, he could request a

photocopy of the materials.  *Id.*, Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no

genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of

law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers

to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine

issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis

of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in

accordance with local court rules, served a concise statement of the material facts as to which it

contends there exist no genuine issues to be tried, those facts will be deemed admitted unless

properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d

---

[10] "D.S.G. Kiebert" is also not named as a Defendant in this action.

Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact.  *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B.  Eleventh Amendment

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities.  *See* Am. Compl.  Plaintiff seeks injunctive relief as

well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity.  *Huang v. Johnson*, 251 F.3d 65, 69 (2d Cir. 2000).  The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.*, 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984)).  Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages.  However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez*, 202 F.3d 593, 595 n.2 (2d Cir. 2000) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)).

### C.  Exhaustion of Remedies

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the

following claims: 1) medical care;[11] 2) mail tampering; 3) law library issues; and 4) family visitation.  Dkt. No. 105, Defs.' Mem. of Law at p. 4.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004).

The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates.  *See Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004).  First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7(a)(1).  The complaint is then submitted to the IGRC to review the grievance.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5).  Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7(b).  Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7(c).  Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983."  *Colon v. Harvey*, 344 F. Supp. 2d 896, 897 (W.D.N.Y.

---

[11] As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues.  *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost . . .," Grievance, dated Aug. 13, 2003.  However, since the Eighth Amendment medical indifference claim is against the John Doe Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir. 2001) & *Santos v. Hauck*, 242 F. Supp. 2d

257, 259 (W.D.N.Y. 2003)).  Moreover, "[e]ven if a prisoner receives no reply to a grievance or

appeal, he is not excused from completing the appeals process. The rules provide that matters not

decided within the prescribed time limits must be appealed to the next level of review." *Walters v.*

*Carpenter*, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. &

REGS. tit. 7, § 701.8[12] & *Mendoza v. Goord*, 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

The Second Circuit has suggested a three-step inquiry when the inmate opposes a

defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must
> ask whether administrative remedies were in fact "available" to the prisoner. *Abney v.*
> *McGinnis*, 380 F.3d 663, 667-68 (2d. Cir. 2004).  The court should also inquire as to
> whether the defendants may have forfeited the affirmative defense of non-exhaustion by
> failing to raise or preserve it, *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), or
> whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may
> estop one or more of the defendants from raising the plaintiff's failure to exhaust as a
> defense, *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004).  If the court finds that
> administrative remedies were available to the plaintiff, and that the defendants are not
> estopped and have not forfeited their non-exhaustion defense, but that the plaintiff
> nevertheless did not exhaust  available remedies, the court should consider whether
> "special circumstances" have been plausibly alleged that justify "the prisoner's failure
> to comply with administrative procedural requirements." *Giano v. Goord*, 380 F.3d at
> 675 (citing *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2003); *Rodriguez* order).

*Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004); *see also Braham v. Clancy*, 425 F.3d 177,

181-82 (2d Cir. 2005).

Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the

defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific

circumstances of each case must be examined.  *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004)

---

[12] N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 states: "[t]ime limit extensions may be requested at any level of
review, but such extensions may be granted only with the written consent of the grievant.  Absent such extension,
matters not decided within the time limits may be appealed to the next step."

(citations omitted).  Some special circumstances include, but are not limited to, occasions when prison officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period.  *Id.* at 677.  The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding."  *Id.* at 676.  Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed."  *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003.  Dkt. No. 8.  Any grievances filed subsequent to that date are untimely and irrelevant to the current action.[13]  Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation.  *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003.  Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken.  *Id.*, Ex. A., Grievance, dated July 10, 2003.  Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted.  Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint.  Dkt. No. 106, Pl.'s Mem. of Law at Point

---

[13] As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Two.  Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust.  *Id.*  Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter.  *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003.  Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003.  Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent.  Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003.  No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response.  *See Walters v. Carpenter*, 2004 WL 1403301, at *3; N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8.

Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit.  With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available."  "'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner."  *Shaheen v. Hollins*, 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v. New York*, 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski*, 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005).  The "proper test for determining whether ordinary grievance procedures were 'available' [is] whether 'a similarly situated individual of ordinary

firmness [would] have deemed them available.'" *McCullough v. Burroughs*, 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York*, 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough*, 2005 WL 3164248, at *3 (quoting *Hemphill v. New York*, 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York*, 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough*, 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir. 2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough*, 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the

*-14-*

purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth

allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be

deemed estopped from asserting the affirmative defense of failure to exhaust.  Since we are

considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will

be deemed exhausted.

### D.  Eighth Amendment Claims

Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health

and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell.  Am.

Compl. at ¶ 42.  Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him

spoiled food which caused him psychological harm.  *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment.

Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of

pain."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428 U.S.

153, 173 (1976)).  To state a claim under § 1983, the inmate "must allege actions or omissions

sufficient to demonstrate deliberate indifference; mere negligence will not suffice."  *Hayes v. New*

*York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996).

The Supreme Court has delineated a two-part test for deliberate indifference.  First, the

"depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he

is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer v. Brennan*, 511

U.S. 825, 834 (1994) (internal quotation marks and citations omitted).  Second, the prison official

must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm

*-15-*

exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.*, 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent*, 508 F.2d 541, 546 (2d Cir. 1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official

*-16-*

of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen*, 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998).  Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984).

Here, Plaintiff claims a known enemy was placed in his cell.  Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep.  Am. Compl. at ¶¶ 27 & 31.  However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy.  A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor.  Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003.  Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.*, Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003.  Even the Superintendent stated that inmates were bunked based on compatibility. *Id.*, Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy.  The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]"  Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8.  He also stated he told his

*-17-*

correction counselor he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines17-23.  Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14.  After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11.  Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference.  First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm.  Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member."  Am. Compl., Ex. "Exhaustion of my Administrative Remedies . . . [with fight investigation]. . .," Fight Investigation Form, dated June. 27, 2003.  However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk.  Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility.  Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.*  Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible.  Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell.  Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety.  This is evidenced by the fact that he had nearly twenty other cellmates.  He was not forced to bunk with another cellmate for an extended period of time.  Even with his first cellmate, he only bunked with him for a month or so.  Pl.'s Dep. at pp. 16, lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell.  Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him.  *Id.* at pp. 30, lines 21-24, & 31, lines 1-11.  Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials.  Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued.  *Id.* at p. 65, lines 22-23.  Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits."  *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food.  *Farmer v. Brennan*, 511 U.S. at 832.  In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."  *Robles v.*

*Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted); *see also Lunney v. Brureton*, 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.*, Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he

"wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted**.

### E.  First Amendment Claims

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further

alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord*, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey*, 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord*, 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) & *Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord*, 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir. 1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal

*-22-*

mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia*, *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)).  Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'"  *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir. 1975); *Gill v. Riddick*, 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]'"  *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott*, 490 U.S. 401, 409 (1989)).  "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights."  *Id.* (quoting *Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir. 1986)).  In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest.  *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath."  Am. Compl. at ¶ 26.  Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions.  Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6.  Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements.  *Id.* at p. 40, lines 19-23.  When Plaintiff was asked about the statement

made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated

penological interest" Midalgo stated that he believed his mail was read because he "agitated [the

facility's] security interest and that . . . gave them a reason to read [his] mail and things [he] was

writing in [his] mail." *Id.* at p. 83, lines 3-8.  Another reason Plaintiff believed the mail was read

was because the inmates who became his cellmates "would try to start a whole situation based on

letters" that Plaintiff had written.  *Id.* at p. 83, lines 9-12.  Plaintiff had submitted a grievance about

his legal mail and it was found to have no merit and that there was no evidence to support his

complaint.  Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A,

Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail.  Plaintiff

has not alleged any deliberate and malicious interference that actually impeded his access to the

courts nor prejudiced an existing action.  Plaintiff also provides no proof that his mail was read

except that he states Defendant Bouyea was mumbling under his breath something similar to what

had been written in Plaintiff's letters.  Moreover, Midalgo has not shown that Bouyea opened and

read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and

that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and

newspaper subscription" or providing them to other inmates.  Am. Compl. at ¶ 22; Pl.'s Dep. at p.

34.  Midalgo says he knew some of his magazines that were in the "rec room" were his because he

saw his name on the label.  Pl.'s Dep. at p. 34, lines 2-4.  He also stated he wrote to the mail clerk to

inquire about his mail, the mail clerk told him that magazines were given to the correction officers

to be handed out, that they were not delivered to him.  *Id.* at p. 34, lines 8-12.  Then when Plaintiff

spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord*, 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23-24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that

there was a practice of this by the Defendants.[14]  Therefore, Plaintiff has failed to state a claim on

his non-legal, incoming mail.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  Even if the Court

were to draw all inferences in favor of Plaintiff that a pattern and practice has been established,

Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant.

Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory

capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the

corrections officers who may have misplaced or destroyed his magazines.

Plaintiff further makes the claim that he received the wrong books and cases from the law

library or that he never received the books requested.  *Id.* at ¶ 48.  Midalgo also alleges that his legal

documents were lost and he was unable to file court documents as a result.  *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts."

*Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004).

This right "requires prison authorities to assist inmates in the preparation and filing of meaningful

legal papers by providing prisoners with adequate law libraries or adequate assistance from persons

trained in the law."  *Bounds v. Smith*, 430 U.S. at 828; *Bourdon v. Loughren*, 386 F.3d at 92

(quoting *Bounds*).  However, there is no "abstract, freestanding right to a law library or legal

assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his

---

[14] The Court also notes that the Defendants fail to address whether or not there was a penological interest in the
regulations or practices that may have affected Midalgo's receipt of non-legal mail.  *See* Defs.' Mem. of Law.

prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. at 351.  The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights."  *Lewis v. Casey*, 518 U.S. at 354.

    As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered.  Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003.  Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library.  *Id.*, Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003.  However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly.  *Id.*, Ex. "Exhaustion of my Administrative Remedies Some Material Lost . . .," Mem. from Captain Racette, dated Aug. 5, 2003.  Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials.  *Id.*, Ex. D., Lt. from Bennett, dated Aug. 19, 2003.  However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index.  Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3.  Plaintiff alleges that every book he requested from the law library was

missing and that one book that he did receive had a section ripped out that Plaintiff needed.  *Id.* at p. 85, lines 1-18.  However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library.  *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry.  *Id.* at p. 74, lines 22-23.  Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases.  *Id.* at pp. 74, line 24, & 75, lines1-20.  Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made.  *Id.* at pp. 79, lines 16-24, & 80, lines 1-8.  As a result, Plaintiff claims that this was another reason why he was unable to file the motion.  *Id.* at p. 80, lines 1-5.  Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures.  *Id.* at p. 81, lines 18-21.  Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff.  *Id.* at pp. 87, lines 10-24, & 88, lines 1-4.  Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings.  *Id.* at p. 88, lines 7-17.

Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents.  Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit.  *See Lewis v. Casey*, 518 U.S. at 354.  Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his

conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F.  Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin*, 940 F. Supp. 639, 642 (S.D.N.Y. 1996) (citing, *inter alia*, *Sandin v. Conner*, 515 U.S.

472, 485 (1995)).  Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological interests.'"  *Hernandez v. McGinnis*, 272 F. Supp. 2d 223, 226 (W.D.N.Y. 2003) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  However, family visitations for inmates only constitute a privilege and not a right.  *See Block v. Rutherford*, 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution)*; see also Lynott v. Henderson*, 610 F.2d 340, 342 (5th Cir. 1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis*, 272 F. Supp. 2d at 227.

Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged.  He merely states that a visit with his mother and brother was delayed by a few hours.  Am. Compl. at ¶ 25.  As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G.  Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and

psychological harm.[15]  Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether a plaintiff had a legitimate expectation of privacy with respect to his conversations.  To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy."  *George v. Carusone*, 849 F. Supp. 159, 165 (D. Conn. 1994) (citing *California v. Greenwood*, 486 U.S. 35, 39 (1988)) (further citations omitted).  Then "that person's subjective expectation must be one that society accepts as reasonable."  *Id.* (citing *California v. Greenwood*, 486 U.S. at 39) (further citations omitted).  The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]"  *Willis v. Artuz*, 301 F.3d 65, 66, & 69 (2d Cir. 2002) (citing *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell.  Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell.  Pl.'s Mem. of Law at Point Eight.  Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs.  Pl.'s Dep. at p. 15, lines 13-17.  He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed.  *Id.* at p. 15, lines 18-24.  Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory

---

[15] Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment.  *See* Am. Compl. at ¶ 52.

as to state any claim in regards to the alleged wiretap.

　　　　With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books.  Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10.  Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant.  Midalgo's claims are merely conclusory and unsupported by any facts.  Furthermore, the Superintendent stated that inmates are placed together based on compatibility.  Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003.  Plaintiff has not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice.  *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984).

　　　　Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H.  John Doe Defendant

　　　　As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12.  FED. R. CIV. P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]"  Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint."  N.D.N.Y.L.R. 4.1.

Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED**; and it is further

**RECOMMENDED**, that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   March 27, 2006
       Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge